1

2

3

4

5

6          **IN THE UNITED STATES DISTRICT COURT**

7          **FOR THE DISTRICT OF ARIZONA**

8

9    Giles Construction, Inc.,                    )
                                                  )          CV-04-258-TUC-CKJ (JCG)
              Plaintiff,                          )
10                                                )          **REPORT AND**
     vs.                                          )          **RECOMMENDATION**
11                                                )
     Commercial Federal Bank, Inc.,               )
12                                                )
              Defendant.                          )
13   _____          )

14          Pending before the Court is the Defendant's Motion for Summary Judgment filed on

15   October 3, 2005 (Doc. No. 28).  The Plaintiff filed a response on November 16, 2005 (Doc.

16   No. 35) and the Defendant filed a reply on December 5, 2005 (Doc. No. 37).   Pursuant to

17   the Rules of Practice in this Court, the matter was assigned to Magistrate Judge Guerin for

18   a report and recommendation.  The Magistrate Judge recommends the District Court, after

19   its independent review of the record, enter an order granting the Defendant's Motion for

20   Summary Judgment on all claims.

21                            **Factual Background**

22          Plaintiff Giles Construction, Inc. ("Giles") is a general contractor.  (DSOF ¶¶17, 61;

23   PSOF ¶¶1, 13.)[1]  In this action, Giles seeks compensation for construction and improvements

24   to a medical facility owned by Canada del Oro ("CDO").  (DSOF ¶37, PSOF ¶8.)  Giles does

25   _____

26          [1]     Defendant's Statement of Facts is herein abbreviated as "DSOF;" Plaintiff's response to
     DSOF (appearing on page 1 and 2 of the pleading captioned "Plaintiff's Controverting Statement of
     Facts") is abbreviated herein as "PSOF"; Plaintiff's Controverting Statement of Facts (beginning on
27   page 2 of the pleading captioned "Plaintiff's Controverting Statement of Facts") is abbreviated herein
     as "PCSOF," and Defendant's Response to Plaintiff's Controverting Statement of Facts is abbreviated
28   herein as "DCSOF."

1  not seek damages from CDO, the LLC that contracted with Giles for the construction work.

2  CDO is not a party to this action.   Rather, Giles brings this action against Defendant

3  Commercial Federal Bank ("CFB"), the commercial lender that financed construction of

4  CDO's medical facility.   (DSOF ¶33; PSOF ¶8).   The undisputed facts regarding the

5  relationship between Giles, CDO, and CFB are as follows.

6         Between June 9, 1999, and June 29, 2000, CDO obtained three loans from CFB for

7  ongoing construction of and improvements to the Canada del Oro Medical Center ("the

8  Project").  (DSOF ¶13; PSOF ¶1.)  The initial work on the Project was done by a contractor

9  other than Giles.

10        In approximately April, 2000, CDO sought to hire Giles to construct further

11  improvements to the Project.   (PCSOF ¶1; DCSOF ¶1.)   Before Giles entered into an

12  agreement with CDO, Giles' President, Patrick Macuilla, called Doug Wingert, the CFB Vice

13  President  in charge of the lending relationship between CFB and CDO.  (DSOF ¶33; PSOF

14  ¶8.)  Macuilla asked Wingert about CDO's financial strength and what had happened to the

15  original contractor on the Project.   (DSOF ¶34; PSOF ¶8.)   Wingert responded to these

16  inquiries by stating that the members of CDO were well-to-do physicians and that he had

17  heard, but did not know, that the prior general contractor was relieved due to lack of

18  performance.  (DSOF ¶35; PSOF ¶8.)  Although Giles questioned the bank about CDO's

19  financial strength, Giles did not make similar inquiries to CDO.  (DSOF ¶37; PSOF ¶8.)

20        Thereafter, on May 12, 2000, Giles and CDO entered into four contracts for

21  construction of improvements to various portions of the Project and, on August 24, 2000, a

22  fifth contract.  (DSOF ¶¶32, 42; PSOF ¶¶8, 10.)  In addition, in connection with CFB's third

23  loan to CDO, CFB and CDO executed a Construction Loan Agreement dated June 29, 2000,

24  which Giles acknowledged.  (DSOF ¶16; PSOF ¶1.)

25        Giles' work on the project included improvements to the Arizona Audiology building

26  and the Alster/Zwart building, both housed at the Project. (DSOF ¶¶32, 47; PSOF ¶¶ 8, 12.)

27  Giles began its construction on the Project on May 17, 2000.  (DSOF ¶39; PSOF ¶8.)  Giles

28  completed construction on or about December 29, 2000.  (DSOF ¶57; PSOF ¶13.)

1    In September, 2000, Jerry Hoyler, Giles' project manager, became concerned about
2 the fact that CDO was delinquent in its payments to Giles.  (PCSOF ¶1, 13, 14; DCSOF ¶14,
3 17, 61.)  Hoyler called Wingert at CFB to inquire into the status of the Project.  (DSOF ¶70;
4 PSOF ¶16.)  At that time, Wingert told Hoyler that CFB had financed only 75% of the
5 construction costs for the Project, and that the remaining 25% would be loaned to CDO by
6 CFB once the Project was completed.  (DSOF ¶70; PSOF ¶16.)

7    On September 19, 2000, Hoyler had another conversation with Wingert, which he
8 secretly tape-recorded.  (DSOF ¶72; PSOF ¶18.)  During that conversation, Wingert stated
9 that construction of the Arizona Audiology building had been completed, had passed
10 inspection, and had been fully funded by CFB.  (DSOF ¶72; PSOF ¶18.)   In response,
11 Hoyler commented that Giles would have to recover any amounts it was owed on that portion
12 of the Project from CDO.  (DSOF ¶73; PSOF ¶18.)  Wingert also stated that with respect to
13 construction of the Alster/Zwart space, the funding might dry up before Giles finished its
14 work. (DSOF ¶76; DSOF Exh 20, pg. 47, lines 2-10.)  Giles nonetheless continued to work
15 on the Project, completing its work on the Alster/Zwart space on November 7, 2000 and
16 performing other work on the Project into December, 2000.  (DSOF ¶¶45, 57; PSOF ¶¶ 12,
17 13.)

18    Both Giles and CFB separately attempted to collect monies owed to them from CDO.
19 Giles recorded mechanic's liens against the Project on September 22, 2000, November 29,
20 2000 and January 21, 2001. (DSOF ¶¶45, 50, 58; PSOF ¶¶12, 13.) On March 9, 2001, Giles
21 filed a lawsuit in Pima County Superior Court against CDO and CFB alleging breach of
22 contract and seeking to foreclose the three mechanic's liens it had previously recorded.
23 (DSOF ¶83; PSOF ¶22.)  CFB was dismissed from the lawsuit because it was never served
24 with the complaint.  (DSOF ¶85; PSOF ¶22.)  Judgment against CDO and in favor of Giles
25 was entered in September 3, 2002. (DSOF ¶84; PSOF ¶22.)

26    CFB's efforts to collect included, on January 12, 2001, sending a demand letter to
27 CDO informing it that the three loans provided by CFB to CDO had been in default since
28 November, 2000.  (DSOF ¶22; PSOF ¶5.)  In addition, on February 28, 2001, CFB recorded

3

1  a Notice of Trustee's sale against the Project and eventually foreclosed on the property.

2  (DSOF ¶¶23, 24, 28; PSOF ¶5.)  CFB suffered a $522,000 loss as a result of its loans to

3  CDO.  (DSOF ¶31; PSOF ¶7.)

4        Two years later, in January, 2003, Giles received documents which had been

5  subpoenaed from CFB by Giles as part of its action against CDO.  (PCSOF ¶22; DCSOF

6  ¶22.)  In reviewing the documents, Giles claims that it discovered information that supports

7  bringing an action against CFB, specifically that:  CFB had been sending letters to CDO in

8  1999 informing them of late payments on loans; in 2000 the main tenant of the Project failed

9  to make three rent payments; CFB had sent notices of late payment to CDO in August, 2000;

10  and CFB had listed CDO on its "watch" list in 2000 because CDO had required further

11  funding.  (PCSOF ¶22; DCSOF ¶22.)

12  **Procedural History**

13        On February 4, 2004, Giles filed an action in the Pima County Superior Court

14  asserting claims for fraudulent misrepresentation, negligent misrepresentation, concealment

15  and non-disclosure against CFB.  (Doc. No. 1, Notice of Removal, Exh. B.)  In its complaint,

16  Giles alleged that CFB misrepresented to Giles the funding status of the loan in order to

17  induce Giles to complete the Project, despite the fact that CFB knew that CDO would default

18  or had defaulted on the loan. (Doc. No. 1, Notice of Removal, Exh. B.)  Giles further alleged

19  that CFB engaged in this misrepresentation in order to recover a completed Project which it

20  could then sell to recover its losses, leaving Giles to take the financial hit.   (Doc. No. 1,

21  Notice of Removal, Exh. B.)

22        On May 14, 2004, CFB removed the action to the United States District Court for the

23  District of Arizona on the basis of diversity jurisdiction.  (Doc. No. 1,  Notice of Removal.)

24  On October 3, 2005, CFB moved for summary judgment against Giles on all of its claims.

25  (Doc. No. 28.)  On December 28, 2005, oral argument on the motion was held before

26  Magistrate Judge Guerin.

27

28

1 **Summary Judgment Standard**

2          In deciding a motion for summary judgment, the Court views the evidence and all

3 reasonable inferences therefrom in the light most favorable to the party opposing the motion.

4 *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d

5 202 (1986); *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.

6 1987).  Summary judgment is appropriate if the pleadings and supporting documents "show

7 that there is no genuine issue as to any material fact and that the moving party is entitled to

8 a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317,

9 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  Material facts are those "that might

10 affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.

11 Ct. at 2510.  A genuine issue exists if "the evidence is such that a reasonable jury could

12 return a verdict for the nonmoving party." *Id*.

13          A party moving for summary judgment initially must demonstrate the absence of a

14 genuine issue of material fact.  *Celotex*, 477 U.S. at 325, 106 S. Ct. at 2553-54.  The moving

15 party merely needs to point out to the Court the absence of evidence supporting its

16 opponent's claim; it does not need to disprove its opponent's claim.  *Id.*; *see also* Fed. R. Civ.

17 P. 56(c).

18          If a moving party has made this showing, the nonmoving party "may not rest upon the

19 mere allegations or denials of the adverse party's pleading, but . . . must set forth specific

20 facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  *See also*

21 *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2514; *Brinson v. Linda Rose Joint Venture*, 53 F.3d

22 1044, 1049 (9th Cir. 1995).  The nonmoving party may not "replace conclusory allegations

23 of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National*

24 *Wildlife Federation*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990).

25 **Discussion**

26          In its Motion, CFB argues that summary judgment in its favor is appropriate because:

27 Giles' claims are barred by the economic loss rule; Giles' claims are time-barred; and facts

28 do not exist to establish the legal elements of Giles' claims.  CFB also argues that it is entitled

1  to its attorneys' fees incurred in this action.  The Magistrate Judge recommends finding that,

2  based on the undisputed facts before the Court, Giles cannot establish the legal elements of

3  its claims, and that even if it did, Giles' claims would be barred on statute of limitations

4  grounds.  The Magistrate Judge recommends that the District Court not reach the issue of

5  whether the economic loss rule applies in this case.   Finally, the Magistrate Judge

6  recommends denial of the request for attorneys' fees.

7  **A.      Misrepresentation and Non-disclosure**

8          *1.      Fraudulent and Negligent Misrepresentation:*

9          To state a claim for fraudulent misrepresentation, Giles must prove that CFB made

10  representations regarding the funding status of the Project that CFB knew to be false, the

11  representations were material, CFB intended Giles to rely on the representations, Giles did

12  not know the representations were false, Giles actually and justifiably relied on the

13  representations, and Giles suffered harm as a result of its reliance.  *See Wells Fargo Credit*

14  *Corp. v. Smith*, 803 P.2d 900, 905 (Ariz.App. 1990).

15          To state a claim for negligent misrepresentation, Giles must demonstrate that CFB,

16  in the course of its business, supplied false information for the guidance of Giles, Giles

17  reasonably relied on the false information, and CFB failed to exercise reasonable care in

18  communicating the information.  *See St. Joseph's Hosp. and Medical Center v. Reserve Life*

19  *Ins. Co.,* 742 P.2d 808, 814 (Ariz. 1987) (citing Restatement (Second) of Torts § 552).

20          Giles cannot support its claims for fraudulent or negligent misrepresentation because

21  (a) there is no evidence that the representations made by CFB were false, and (b) there is no

22  evidence that Giles reasonably relied on the representations.  Giles claims that CFB made

23  false statements regarding the funding status of the Project to induce Giles to continue work

24  on the Project.  (Complaint, ¶XIV.)  Giles cites two statements by CFB: (1) Mr. Wingert's

25  statement to Patrick Macuilla in approximately April 2000 that all of the members of CDO

26  were well-to-do individuals with strong financial portfolios (DSOF ¶35, PCSOF ¶9), and (2)

27  Mr. Wingert's statement to Mr. Hoyer in September, 2000 that CFB had financed 75% of the

28  CDO construction costs and that the remaining 25% would be loaned to CDO "once the

1  project was completed, meaning a full product, buildings complete." (DSOF ¶70, PSOF ¶16

2  and PCSOF ¶15.)[2]   There is no evidence in the record that either of these statements were

3  false. CFB's knowledge of CDO's late payments in early 1999, does not demonstrate that Mr.

4  Wingert's statement was false. CDO's members could have been well-to-do individuals with

5  strong portfolios, even if CDO, as an entity, was experiencing financial difficulty. Similarly,

6  there is no evidence suggesting that Mr. Wingert's statement that CDO would loan the

7  remaining 25% upon project completion was false. Although Giles was never paid the full

8  amount that it was owed pursuant to its contract with CDO (PCSOF ¶17, DCSOF ¶17), Giles

9  admitted that its failure to receive payment was attributable to CDO, not a lack of funding

10 by CFB. (DSOF ¶¶ 73, 75; PSOF ¶18.) Giles also alleges generally that "Plaintiff was misled

11 by Defendant into believing that once the project work was completed that Plaintiff would

12 be paid in full." (Plaintiff's Response, pg. 5.) Giles, however, fails to identify, either in its

13 papers or at oral argument, any specific false statement by CFB which would support this

14 claim.[3]

15      In addition, no reasonable fact finder could conclude that Giles reasonably relied on

16 either or both statements to support its belief that it would be paid in full by CDO once the

17 Project was completed. The financial status of the members of an LLC would not indicate

18 the financial strength of the entity. Nor would the fact that CFB intended to loan additional

19 funds to CDO ensure that CDO would in turn remit these funds to Giles. In fact, Giles'

20 president testified that when he learned that CFB had known in 1999 that CDO was having

21 difficulty paying its loans on time, it did not strike him as the type of information that CFB

22

23      [2] Giles alleges that Mr. Leon, the managing member of CDO, also made false statements
   regarding the funding status for the Project. Giles cannot, however, attribute to CFB, statements
24 made by CDO representatives regarding actions by CFB. Moreover, the terms of the June 29, 2000
   loan agreement between CDO and CFB, which Giles also, signed, expressly stated that CDO would
25 not be CFB's agent for any purpose. (DSOF ¶18; PSOF ¶2.)

26      [3] Review of the record is difficult because Giles' Response to CFB's Motion for Summary
   Judgment does not include specific references to any portion of the record. When asked at oral
27 argument to identify evidence of specific false statements in the record, Giles' attorney stated she
   believed that the false statements may be found in Mr. Leon's affidavit (attached as unnumbered
28 exhibit to PSOF, Doc. No. 36) and Mr. Hoyer's deposition. (DSOF, Exh. 20.)

7

1  should have shared with him or with Giles, nor did he expect CFB to share information

2  regarding the financial health of their borrower, CDO.[4]  (DSOF ¶87-88; PSOF ¶22.)

3       This Court concludes that no reasonable factfinder could conclude that Giles

4  reasonably relied on statements made by agents or representatives of CFB.  Giles also had

5  no right to rely on statements made by CFB.  The  right to rely corresponds with the existence

6  of a duty.  *See Arizona Title Co. v. O'Mally Lumber Co.*, 484 P.2d 639, 646 (Ariz. App. 1971)

7  (recognizing a duty on the part of a lender on a project that gives rise to a corresponding right to

8  reliance in the contractors on the project).  Because, for the reasons stated in Section A.3, CFB did

9  not owe a duty to Giles, Giles also did not have a right to rely on CFB.

10      *2.      Fraudulent Concealment*

11      In order to state a claim for concealment, Giles must prove that CFB and Giles were

12  parties to a transaction in which CFB intentionally prevented Giles from acquiring material

13  information.  *See Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons*

14  *Local,* 38 P.3d 12, 34 (Ariz. 2002) (citing Restatement (Second) of Torts § 550)).  Fraudulent

15  concealment must be proven by clear and convincing evidence.  *See id.,* 38 P.3d at 36, n.24.

16  Giles cannot establish a claim for fraudulent concealment because:  (a) CFB was not a party

17  to a transaction with Giles, and (b) Giles cannot establish by clear and convincing evidence

18  that CFB intended to prevent Giles from discovering the truth regarding CDO's financial

19  status.

20      Giles' only support for its claim that it was a party to the transaction with CFB is the

21  fact that it acknowledged the June 29, 2000 contract between CFB and CDO.  It is clear from

22  that contract, however, that CFB and CDO were the only intended parties to the transaction.

23

24      [4] Notably, Giles also knew just weeks after CFB allegedly promised to fund the remaining
25% of the Project upon completion that in fact CFB was concerned that funding would dry up
25  before completion. (DSOF ¶76; DSOF Exh 20, pg. 47, lines 2-10.)   Giles knew that it was CFB's
position that additional funds would have to be obtained from CDO, not CFB. (DSOF ¶¶ 73, 75;
26  PSOF ¶18.) Giles nevertheless continued work on the Project. (DSOF ¶ 45; PSOF ¶ 12.)  Macuilla
also testified that he never asked Joseph Leon, the managing member of CDO, for any information
27  regarding CDO's financial strength. (DSOF ¶37; PSOF ¶8.) Thus, in addition to Giles not expecting
CFB to provide information regarding CDO's financial status, Giles did no other investigation into
28  the financial security of the Project or CDO before signing on as general contractor.

8

1   The contract expressly provides: "this agreement is made for the sole benefit and protection

2   of BORROWER and BANK . . . no person, persons or entities shall constitute a creditor,

3   third party or incidental beneficiary hereto, or be otherwise entitled to any rights or benefits

4   hereunder."   In addition, CFB and CDO were bound by several other loan agreements that

5   made no mention of Giles and to which Giles was not a party.

6         Similarly, there is no evidence in the record, much less clear and convincing evidence,

7   from which a jury could reasonably conclude that CFB intentionally withheld information

8   from Giles.  There is no evidence to suggest that when Wingert reported in September, 2000,

9   that CFB would be providing additional funding to CDO for the Project upon completion,

10  that he knew CFB would not in fact do so and intentionally withheld that fact from Giles.

11  Likewise, although CFB knew in 1999 that CDO was having difficulty making its payments,

12  there is no evidence to suggest that when Wingert told Giles in April of 2000 that CDO's

13  members were individuals with strong portfolios that he intended to conceal the status of

14  CDO's payment history.  In fact, in direct contrast to Giles' claims, CFB likely had a duty *not*

15  to disclose to Giles confidential information regarding its borrower's financial status.  *See*

16  *Kesselman v. National Bank of Arizona*, 937 P.2d 341, 343-44 (Ariz.App. 1996).  CFB's

17  performance of its duty to protect client confidences should not be misconstrued as

18  intentional concealment.

19        *3.     Non-Disclosure*

20        In order to state a claim for non-disclosure, Giles must demonstrate that CFB failed

21  to disclose to Giles information regarding the funding status of the Project that CFB knew

22  would justifiably induce Giles to refrain from getting involved in the Project and/or

23  continuing on the Project, and that CFB was under a duty to Giles to exercise reasonable care

24  to disclose the funding information.  *See* Restatement (Second) of Torts § 551; *see also Wells*

25  *Fargo*, 201 Ariz. at 496, n.22.

26        Summary judgment in favor of CFB is appropriate on this claim because CFB did not

27  owe Giles a duty of care.  Whether a duty exists is a question of law for the court.  *See Luce*

28  *v. State Title Agency, Inc.,* 950 P.2d 159, 161 (Ariz.App. 1997).  In some circumstances, the

9

1  existence of a duty may depend on preliminary questions that must be determined by a fact

2  finder. *See Diggs v. Arizona Cardiologists, Ltd.,* 8 P.3d 386, 388 (Ariz.App. 2000).  As a

3  general rule, a bank has no duty to third parties to disclose information about a customer's

4  account. *See Kesselman v. National Bank of Arizona*, 937 P.2d 341, 343-44 (Ariz.App. 1996)

5  (collecting cases).   However, if a bank is "directly involved with the third parties [to the

6  lending transactions],"*id.* at 345, this special circumstance may give rise to a duty on the part

7  of the bank such that "if [the bank] knows that the [third party] is about to enter into [the

8  transaction] under a mistake as to facts basic to the transaction, and that the [third party],

9  because of [its relationship with the bank], the customs of the trade or other objective

10  circumstances, would reasonably expect a disclosure of those facts," the bank must exercise

11  reasonable care to disclose such facts to the other party.  *Frazier v. Southwest Sav. & Loan*

12  *Ass'n,* 653 P.2d 362, 367-68 (Ariz.App. 1982).

13      CFB may have owed a duty of care to Giles if CFB was directly involved with Giles;

14  however, there is no evidence that CFB's involvement in the Project was anything other than

15  the standard involvement of a commercial lender on a construction project.  Giles relies on

16  *Arizona Title Co. v. O'Mally Lumber Co.*, 484 P.2d 639 (Ariz. App. 1971) in support of its

17  argument that CFB did in fact owe it a duty of care.  This case is factually inapposite.  In

18  *Arizona Title*, a borrower obtained a $27,000 loan from one lender in order to pay off

19  existing mortgage debt on the borrower's property.  *See id.* at 642.  The lender agreed to

20  provide the borrower with a $195,000 construction loan on the condition that the $27,000

21  loan would be paid off and the $195,000 construction loan would have a first priority

22  position.  *See id.*  The borrower then obtained financing from a second lender to pay off the

23  $27,000 loan from the first lender, as well as a judgment lien that had been recorded against

24  the property.  *See id.*  The borrower and the second lender agreed that the second lender

25  would receive the $195,000 construction loan from the first lender, use large portions of the

26  first four installments of that loan to pay itself back for the two loans that it had issued to the

27  borrower, and then apply the remainder to construction costs. *See id.*  At the outset, the

28  second lender had information in its possession which demonstrated that once it reimbursed

10

1 itself, the remainder of the construction loan would not cover the costs of construction.

2 Nevertheless it told contractors that they would be paid for their construction work. *See id.*

3 When the contractors sued that lender for negligent misrepresentation and nondisclosure, the

4 Arizona Court of Appeals concluded that the second lender was directly involved with the

5 contractors because the lender (1) acted as the disbursing agent to the contractors and (2) had

6 a substantial financial interest in the project's completion. The court reasoned that it served

7 the lender's pecuniary interests to keep the contractors working so as to assure that continued

8 draws of money would be available to repay its own loan. *See id.* at 645-646.

9       In the present case, there is no evidence to suggest that CFB's involvement in the

10 Project rose to the level of the lender's involvement in *Arizona Title*. Although CFB issued

11 checks to Giles for its work on the Project (PCSOF ¶13, DCSOF ¶13), CFB was not

12 receiving funds from another source and allocating/disbursing those funds to itself and the

13 contractors. In addition, while CFB had an interest in the Project's completion, recovery of

14 its loan did not depend upon the performance of the contractors, as was the case in *Arizona*

15 *Title.* The fact that Macuilla, Giles' president, testified that he did not expect CFB to disclose

16 financial information regarding CDO to Giles is further evidence that CFB and CDO did not

17 have the type of relationship that the bank and contractors had in *Arizona Title*. In sum,

18 because CFB was not directly involved with Giles in the Project, CFB did not owe a duty

19 to Giles to disclose information regarding the funding status of the Project and Giles' claim

20 for non-disclosure must fail.

21 **B.**     **Statute of Limitations**

22       Summary judgment in favor of CFB is appropriate for the additional reason that Giles'

23 claims are time barred.

24       Giles' claims for fraudulent misrepresentation and concealment are governed by a

25 three-year statute of limitations, pursuant to A.R.S. § 12-543, and its claims for negligent

26 misrepresentation and non-disclosure are governed by a two-year statute of limitations,

27 pursuant to A.R.S. § 12-542. Under Arizona's discovery rule, a statute of limitations begins

28 to run when the plaintiff discovers or reasonably should have discovered facts giving rise to

1  his/her claim.  *See Mister Donut of America, Inc. v. Harris*, 723 P.2d 670 (Ariz. 1986)

2  (applying discovery rule to A.R.S. § 12-543); *Doe v. Garcia*, 5 F.Supp.2d 767, 770 (D. Ariz.

3  1998) (applying discovery rule to A.R.S. § 12-542).

4        *1.     Negligent and Fraudulent Misrepresentation*

5        The statute of limitations on Giles' claims for negligent and fraudulent

6  misrepresentation began to run when Giles knew or should have known that CFB's

7  representations were allegedly false.  The statements by CFB which Giles alleges to be false

8  were made over three years before this lawsuit was initiated.  Wingert's statement that all

9  members of CDO were well-to-do individuals with strong financial portfolios was made in

10  April 2000.  His statement that CFB had financed 75% of the CDO construction costs was

11  made in September 2000.  Assuming that these statements did amount to false representations

12  that Giles would be fully paid upon completion of the Project, as Giles contends, Giles knew

13  or should have known that the statements were false by late 2000 or, at the latest, early 2001.

14  It is undisputed that as early as September 2000, Hoyler, Giles' project manager, was

15  concerned about the fact that CDO was delinquent in its payments to Giles.  Giles knew in

16  November, 2000 that CFB was concerned that the funding would dry up before Giles' work

17  was completed.  Giles began recording mechanic's liens against the Project in September and

18  recorded additional liens in November, 2000, and January 2001.  Further, Giles initiated a

19  lawsuit against Giles and CFB in March 2001.  By January 2001, Giles should have been

20  aware that the veracity of promises by CFB that Giles would be fully paid (assuming Mr.

21  Wingert's statements amounted to such a promise) was questionable.  Accordingly, Giles'

22  claim for negligent misrepresentation is barred by the two-year statute of limitations and

23  Giles' claim for fraudulent misrepresentation is barred by the three-year statute of limitations.

24        *2.     Fraudulent Concealment and Non-Disclosure*

25        Even if Giles were able to support its claims for fraudulent concealment and non-

26  disclosure, the claims also would be barred by the statute of limitations.  The statute of

27  limitations on Giles' fraudulent concealment and non-disclosure claim began to run when

28  Giles knew, or should have known with the exercise of due diligence, that CFB concealed

1  information. Giles contends that it did not discover evidence of intentional concealment until

2  January, 2003, when, during discovery in its state law action, it was provided with documents

3  suggesting that CFB knew CDO was struggling to make loan payments in 1999.  Giles may

4  not have been provided with actual documents until January 2003, but no reasonable juror

5  could conclude that Giles did not know or with reasonable diligence could not have

6  discovered that CDO was struggling financially and that CFB was aware of that struggle at

7  least three years before this lawsuit was filed in May 2004.  As noted above, Giles knew in

8  September or November of 2000 that no further funding was forthcoming from CFB.  In

9  September 2000, Giles was aware that CFB was concerned that the funding for the Project

10  would dry up before Giles completed its work; CFB told Giles of this concern.  (DSOF ¶76;

11  DSOF Exh 20, pg. 47, lines 2-10.)  By CFB's statement to Giles, it is clear that CFB also

12  knew that CDO may not have had the money to pay Giles for all of its work on the Project.

13   If CFB had intentionally misled Giles with respect to the funding status of the Project, Giles

14  was aware at least three years before initiating suit, that it had been misled when CFB

15  acknowledged its concerns about the available funding in September, 2000.  Similarly, if

16  CFB failed to disclose information regarding the funding status, Giles was sufficiently aware

17  of the existence of the information at least two years prior to bringing this action.

18  **C.      Application of the Economic Loss Rule**

19         The economic loss rule bars a party from recovering economic damages in tort unless

20  accompanied by physical harm, either in the form of personal injury or secondary property

21  damage.  *Carstens v. City of Phoenix*, 206 Ariz. 123, 126, 75 P.3d 1081, 1084 (Ct. App.

22  2003).   In general, the rule prevents plaintiffs from converting contract claims into tort

23  claims.  Where a plaintiff alleges purely economic losses, the damages sound in contract, and

24  tort recoveries are prohibited by the economic loss rule.

25         CFB contends that Giles' claims are barred by the economic loss rule because Giles

26  does not claim personal injury or property damage.  Giles acknowledges that the economic

27  loss rule prevents recovery in certain cases, but contends that the economic loss rule applies

28  only in tort cases involving defective construction in a construction project or a defect in

13

1   some type of product. As this case involves neither defective construction nor a defective

2   product, Giles asserts that the economic loss rule does not apply.

3          The economic loss rule has received limited application in Arizona courts. The

4   Arizona courts have repeatedly recognized the economic loss rule in construction defect

5   cases, where the plaintiff has sustained purely economic loss as a result of a contractor's

6   faulty construction and seeks to recover from the contractor under both contract and tort

7   theories. *See generally Woodward v. Chirco Constr. Co.*, 687 P.2d 1269 (Ariz. 1984);

8   *Colberg v. Rellinger,* 770 P.2d 346 (Ariz. App. 1988); *Hayden Business Center*

9   *Condominiums Ass'n v. Pegasus Development Corp.*, 105 P.3d 157 (Ariz. App. 2005);

10  *Carstens,* 75 P.3d 1081; *Menendez v. Paddock Pool Constr. Co.,* 836 P.2d 968 (Ariz. App.

11  1991); *Matusik v. Dorn*, 756 P.2d 346 (Ariz. App. 1988); *Nastri v. Wood Bros. Homes, Inc.*,

12  690 P.2d 158 (Ariz. App. 1984). The Arizona courts have also recognized the economic loss

13  rule as one factor to consider in determining whether a claim arising from a defective product

14  should be treated as a contract or tort claim. *See Salt River Project Agr. Imp. and Power*

15  *Dist. v. Westinghouse Elec. Corp.*, 694 P.2d 198 (Ariz. 1984).

16         Other than construction and product defect cases, however, the Arizona courts have

17  not applied the economic loss rule as a bar to the recovery of economic damages in tort cases.

18  To the contrary, Arizona courts have issued numerous decisions permitting the recovery of

19  purely economic losses in tort actions. *See generally Paradigm Ins. Co. v. Langerman Law*

20  *Offices*, P.A., 24 P.3d 593 (Ariz. 2001); *St. Joseph's Hosp. and Medical Center v. Reserve*

21  *Life Ins. Co.,* 742 P.2d 808 (Ariz. 1987); *Donnelly Constr. Co. v. Oberg/Hunt/Gilleland*, 677

22  P.2d 1292 (Ariz. 1984); *Fillmore v. Maricopa Water Processing Systems, Inc., 120 P.3d 697*

23  (Ariz. App. 2005); *Kuehn v. Stanley*, 91 P.3d 346 (Ariz. App. 2004); *Luce v. State Title*

24  *Agency, Inc.*, 950 P.2d 159 (Ariz. App. 1997); *Standard Chartered PLC v. Price Waterhouse*,

25  945 P.2d 317 (Ariz. App. 1996).

26         Federal courts, however, have construed Arizona's economic loss rule more broadly

27  than the Arizona courts. The Ninth Circuit has applied the economic loss rule in the context

28  of product liability, not as a factor to be considered in evaluating whether a claim arising

14

1    from a defective product should be treated as a contract or tort claim, but as a complete bar.

2    *See Apollo v. Avnet, Inc.,* 58 F.3d 477 (9th Cir. 1995).  The Ninth Circuit's decision in *Apollo*,

3    however, can be distinguished from the present case both because it was a product liability

4    case whose holding was limited to "the facts before the panel," *Apollo*, 58 F.3d at 480, and

5    because the Arizona courts have clarified the intended scope of the economic loss rule since

6    *Apollo* was decided.  *See, e.g., Carstens,* 75 P.3d 1081.

7         Following on the Ninth Circuit's broad construction of the economic loss rule in

8    *Apollo*, the Arizona District Court has concluded that the economic loss rule bars the

9    recovery of economic damages in tort unless the plaintiff lacks privity with the defendant,

10   *see Southwest Pet v. Koch Indus., Inc.*, 89 F.Supp.2d 1115 (D. Ariz. 2000), and more recently

11   that the economic loss rule bars recovery of economic damages in a negligent

12   misrepresentation case. *See Wojtunik v. Kealy*, 394 F.Supp.2d 1149 (D. Ariz. 2005).  These

13   decisions are not firmly supported by Arizona law, however, and the district court in this case

14   is not required to treat these cases as precedential.

15        Given the discrepancy between Arizona and federal law on the application of the

16   economic loss rule, and given that Giles' claims do not withstand summary judgment for the

17   reasons stated in Sections A and B above, the Magistrate recommends that the district court

18   not reach the issue of whether the economic loss rule also bars Giles' recovery in this case.

19   **D.    The prevailing party is not entitled to its attorneys' fees incurred in this action**

20        CFB contends that it is entitled to an award of its attorneys' fees because the action

21   arises as a result of CFB's contract with CDO.  Giles contends that CFB, CDO and Giles

22   were all parties to that contract, and therefore attorneys' fees are recoverable by the

23   prevailing party to this action.

24        The Magistrate Judge recommends finding that, because this action arises in tort,

25   attorneys' fees are not recoverable by either party.  The fact that there were numerous

26   contracts involved during construction of the Project does not change the fact that Giles has

27   asserted tort claims.  Attorneys' fees are not recoverable in a tort action.  *See In re Larry's*

28   *Apartment, L.L.C.*, 249 F.3d 832 (9th Cir. 2001) (collecting Arizona state court cases that

1 stand for the proposition that where a contract is merely somewhere within the factual

2 background, an award of fees under § 12-341.01(A) is not proper).

3 **Recommendation**

4 The Magistrate Judge recommends the District Court, after its independent review of

5 the record, enter an order

6 GRANTING the Defendant's Motion for Summary Judgment (Doc. No. 28) on all of

7 Plaintiff's claims and DENYING the Defendant's request for an award of attorney's fees.

8 Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections within

9 10 days of being served with a copy of this Report and Recommendation.  If objections are

10 not timely filed, they may be deemed waived.  If objections are filed, the parties should use

11 the following case number: **04-0258-TUC-CKJ**.

12 **DATED** this 3rd day of August, 2006.

13

14 Jennifer C. Guerin
United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16